IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 15, 2020 Session

## STATE OF TENNESSEE v. BENJAMIN R. FRANKLIN

**Appeal from the Circuit Court for Houston County**
**No. 2016-CR-44      Suzanne Lockert-Mash, Judge**

_____

### No. M2018-01958-CCA-R3-CD

_____

The Defendant, Benjamin R. Franklin, appeals his convictions for three counts of vehicular homicide by intoxication and three counts of vehicular homicide by reckless driving.   The Defendant argues that (1) the trial court erred by admitting Tennessee Bureau of Investigation (TBI) blood and urine test results; (2) the court erred by admitting photographs of the victims at the crash scene; (3) the evidence was insufficient relative to intoxication; (4) the court erred by denying the Defendant's motion for a mistrial during the State's rebuttal argument; and (5) the court erred in sentencing by imposing the maximum sentence, ordering consecutive sentencing, and suspending the Defendant's driver's license for ten years.   After a thorough review of the record and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Benjamin R. Franklin.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Talmage M. Woodall and Jack Arnold, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case arises from an October 12, 2015 car crash in which twenty-year-old William Griggs, nineteen-year-old Kassidy Leonard, and their twelve-day-old daughter were killed.   The February 2016 term of the Houston County Grand Jury indicted the

-1-

Defendant on three counts of vehicular homicide by intoxication and three counts of vehicular homicide by recklessness. See Tenn. Code Ann. §§ 39-13-213(a), 55-10-401.

At trial, Anthony Grundy testified that on October 12, 2015, just after 5:00 p.m., he was driving southbound on Highway 13 and that he was behind a Dodge truck. He estimated that the truck was about one-quarter of one mile ahead of him and that it was driving between fifty-five and sixty miles per hour, the same speed as Mr. Grundy. Mr. Grundy observed the Dodge "[l]ess than a couple of minutes" in total and denied that he ever saw it cross into the northbound lane. He identified a photograph of the relevant portion of the two-lane highway. At a curve in the road, Mr. Grundy lost sight of the truck momentarily "because of the trees inside of the curve," and when Mr. Grundy came around the curve, the Dodge truck was "flipped upside down." Mr. Grundy clarified that as he came around the curve, "the accident was already occurring" and that he did not see the "initial contact."

Mr. Grundy testified that he drove past the crash, pulled over, and dialed 911. He noted that he "knew that it was pretty bad at that point." He walked back to the vehicles while on the telephone and checked on the victims' sedan, which was stopped in the northbound lane. Mr. Grundy stated that the male driver appeared to be deceased, that an infant in the back seat was deceased, and that a woman in the driver's side back seat was "slowly moving." Mr. Grundy told her to remain still and proceeded to the Dodge. Mr. Grundy eventually found the unconscious Defendant thirty feet away from the truck on the ground. Other people from Mr. Grundy's workplace began to arrive at the scene, and he returned to the woman in the sedan, who was no longer moving. Mr. Grundy stated that after a few minutes, the Defendant "started to recover" and told Mr. Grundy his name. After the paramedics arrived about thirty minutes later, Mr. Grundy left.

Tennessee Highway Patrol (THP) Trooper Garret Flannery testified that he responded to the scene of the crash at about 6:17 p.m. He noted that the road was dry, straight, and had a double yellow line. Houston and Humphreys County Sheriff's deputies were already on the scene, and the Defendant was not present. Photographs of the crash scene showed that the Defendant's white Dodge pickup truck was upside down on the right side of the road and perpendicular to it such that the front end of the truck faced the road. The front portion of the truck was severely damaged, and a red substance was visible on the bumper. The victims' Saturn sedan sat perpendicular to the road on the left shoulder, with the back end of the sedan facing the road. The sedan was so damaged that the front portion of it was not recognizable.

Trooper Flannery testified that Mr. Griggs was in the driver's seat and that Ms. Leonard was in the backseat on the driver's side; both of them were deceased upon his arrival. Trooper Flannery identified the adult victims in a photograph taken at close range, showing the tops of their heads and a portion of their upper bodies; blood was visible on

-2-

their arms and on Mr. Griggs's head. In a second photograph showing the right exterior side of the sedan, the adult victims were barely visible, and an item covered with a black tarp was in the foreground.[1]

Trooper Flannery testified that the infant victim, who was also deceased, was in a car seat located outside the sedan on the right side. He was informed that a bystander had taken the infant victim and the car seat out of the sedan. A photograph showed a close-up view of the car seat; the infant victim's head and torso were covered by a white blanket, and one of her hands and her bare feet were visible. A small quantity of blood was visible on her arm.

THP Sergeant Allan Brenneis, an expert in crash reconstruction and crash scene analysis, testified that he responded to the crash scene around 7:00 p.m. and marked relevant evidence with paint. He noted that it rained later that evening and that the following day, he returned to the scene and used a "total station," which was a piece of surveying equipment that took measurements between marked points using a laser, to make a diagram of the scene.

Sergeant Brenneis testified that the Saturn's hood was "peeled back" and that the crash was an "offset head-on crash" in which the vehicles were not aligned. Sergeant Brenneis noted "folding" in the front of the Defendant's truck, which indicated the place in which it made contact with the Saturn. He explained that by using the physical evidence at the scene, he concluded that the Defendant's truck was three feet over the center line at the time of the impact. He was unable to determine the speed of either vehicle because "[a]nything that it had going forward was dissipated upon impact." Neither vehicle contained a "Crash Data Retrieval System," or "black box" that collected data when an accident occurred.

Sergeant Brenneis testified that gouges in the roadway were created by the truck's undercarriage and the Saturn's being "hit, reversed and knocked around[.]" He explained that the left front tire of the truck ran over the Saturn, which "push[ed] the Saturn down into the ground" and resulted in the Dodge's flipping over. The Saturn was halted and rotated by the force of the impact. He agreed that the gouges in the road were indicative of the force with which the Dodge hit the Saturn. Tire marks showed the location of the Dodge's right tires at the time of the collision. Sergeant Brenneis noted that it was "pretty obvious" that the Defendant's truck crossed the center line and that the Saturn did not leave its lane of travel until it was hit. No evidence indicated that the Defendant attempted to swerve before hitting the Saturn.

Sergeant Brenneis testified that he performed a full inspection of both vehicles. The Defendant's truck did not reflect any mechanical problems; although the truck was

---

[1] It was apparent from the shape of the item that it was the infant victim's car seat.

-3-

subject to recalls, they were not of any significance in this incident. The Defendant was not wearing a seatbelt. The victims' Saturn similarly did not reflect any mechanical malfunctions prior to the crash. Sergeant Brenneis noted that his training included the effect of various substances on drivers, and he stated that the crash was "entirely consistent with what [he saw] at the scene of [accidents involving] impairment or intoxication." He estimated that he worked about one hundred twenty "criminal" cases per year and that eighty percent of those involved drugs or alcohol.

On cross-examination, Sergeant Brenneis testified that there was "an indication of some braking coming into" the crash from the right rear tire of the Dodge. Sergeant Brenneis acknowledged that he did not find beer cans, syringes, or prescription pill bottles in the Dodge and that he did not smell alcohol in either vehicle. He reiterated that the accident was consistent with a driver who was impaired or "reckless" based upon his "experience of what [he'd] seen, how drivers react, how they respond when they do cross over lines or do various things. The most probable answer." Sergeant Brenneis estimated that based upon the angle of impact, the Defendant was driving in the northbound lane between five and ten seconds. He agreed that this crash was also consistent with a person's sending a text message or reaching for a dropped cell phone; he denied that it was consistent with a driver's having a heart attack.

On redirect examination, Sergeant Brenneis testified that the Defendant's urine test was positive for amphetamine, methamphetamine, and oxycodone. He stated that his estimate of the time the Defendant was in the victims' lane of travel was meant to convey that the Defendant drifted into the lane rather than making a "rapid turn." Sergeant Brenneis agreed that the crash was consistent with a driver impaired by oxycodone. He elaborated that in such cases, he expected "a slow movement . . . [and] drifting."

On recross-examination, Sergeant Brenneis acknowledged that the Defendant's urine test also reflected lidocaine; he noted that he had excluded the lidocaine as a contributing factor because lidocaine had been administered at the hospital. He agreed that he was not a toxicologist.

Three Rivers Hospital Registered Nurse Nancy Daniel testified that on October 12, 2015, she reported to the emergency room in response to the crash in this case. She arrived around the same time as the ambulance transporting the Defendant. She explained that her duties included stabilizing the Defendant and "packag[ing] him ready for transport" to a hospital able to provide a higher level of care. Ms. Daniel stated that the Defendant was "somewhat combative"; he wanted to get "off the [spine] board" on which he was secured; he asked for water; he pulled at his cervical collar; he spat on members of staff; and he did not follow requests to remain still in order for medical personnel to "get IVs [intravenous needles] and hook him up to monitors to help him." Ms. Daniel attempted "many times" to explain to the Defendant what they were doing and that they were trying to help him.

Ms. Daniel noted that they were unable to insert an IV needle and instead placed an "intraosseous needle" or "IO" into the bone; she explained that an IO was not typically used in adults and was only required in cases when a patient was "critical" or had lost a large volume of blood, in which case the patient had "no volume to expand the veins." The Defendant underwent multiple blood and laboratory tests, as well as a CT scan to rule out skull fractures or a brain bleed.

Ms. Daniel testified that she had worked as an emergency room nurse for twenty-five years and that she treated an innumerable number of motor vehicle accident patients who had sustained head injuries or were under the influence. When asked whether she thought the Defendant was under the influence based upon her experience, Ms. Daniel stated, "I knew there was something probably — we call it 'on board' . . . and there's medications that you can give to reverse some of it and you want to know because it may help his behavior . . . and I assumed that it may [have been] 'on board[.]'" Ms. Daniel based her opinion on the Defendant's combative behavior and his lack of a head injury.

On cross-examination, Ms. Daniel testified that the Defendant had "some blood on him"; she did not know whether the Defendant had lost "a lot of blood." She acknowledged that a doctor interpreted the CT scans and that someone else would have gone through "conc[u]ssion protocols" with the Defendant. She further acknowledged that she had treated trauma patients who were not under the influence and also had to be restrained due to being "emotional or combative." Ms. Daniel agreed that a trauma patient was given IV fluids in order to stabilize the blood pressure; she acknowledged that a trauma patient could be dehydrated or have lost a quantity of blood. She admitted that she was not "completely sure" that the Defendant was under the influence.

Three Rivers Hospital Registered Nurse Stephanie Fisher testified that in October 2012, she worked in the emergency room and treated the Defendant. Ms. Fisher stated that the Defendant was brought to the emergency room by ambulance with a "bunch of abrasions" after a car crash. Ms. Fisher noted that the Defendant had one IO needle inserted in his leg; when Ms. Fisher attempted to insert an additional IV line, which was standard protocol, she could not find "any good veins"; the Defendant's veins had scars "overlying them" and Ms. Fisher had to place a second IO needle in his other leg. Ms. Fisher had only placed IO needles in child patients previously. Ms. Fisher stated that the scarring on the Defendant's arms was consistent with patients she had encountered in the past who had admitted to drug use.

Ms. Fisher testified that she asked the Defendant if he used "IV drugs" and that he "said yes, sometimes"; when asked what he used, the Defendant stated "Oxies that [were] prescribed to" him. Ms. Fisher noted that oxycodone was not prescribed to be injected intravenously. Relative to the Defendant's behavior, Ms. Fisher stated that the Defendant "was very uncooperative, kept removing his oxygen mask, yelling loudly that he wanted

something to drink." Ms. Fisher explained to the Defendant why he could not drink anything, then decided to give him a wet washcloth to place in his mouth. When Ms. Fisher placed the washcloth in the Defendant's mouth, he bit down and caught Ms. Fisher's glove between his teeth.

Ms. Fisher testified that she previously worked for "home health" and a nursing home, and she had treated so many IV drug users in those jobs that she could not count them. Ms. Fisher stated that generally, an IV drug user could identify viable veins for medical personnel; she was not "able to do that" with the Defendant. Ms. Fisher accompanied the Defendant to his CT scan; during the scan, the Defendant was uncooperative, "thrashed about, moved his head back and forth," and had to be instructed to be still. When asked whether motor vehicle accident patients were typically "a little bit tough to deal with," Ms. Fisher stated, "It happens occasionally." She noted that once she explained to a patient that she was trying to treat him, "that usually work[ed]" to calm him down but that it was not effective with the Defendant. In Ms. Fisher's opinion, the Defendant was "probably impaired."

On cross-examination, Ms. Fisher testified that dehydration and blood loss would also make it difficult to find a vein in which to place an IV needle. She clarified that the scars on the Defendant's arms were "overlying the veins." Ms. Fisher based her opinion about the Defendant's intoxication on his combative behavior. She agreed, however, that she had seen combative trauma patients who were not under the influence.

On redirect examination, Ms. Fisher testified that even after a blood transfusion and rehydration, it would not be easier to find a viable vein if a patient was an IV drug user, whereas the veins of a patient who did not use IV drugs would improve. Ms. Fisher stated that the Defendant had a "scabbed area" on his hand that was "pretty fresh."

Dr. Thomas M. Hamilton, a retired emergency room physician at Three Rivers Hospital, testified that on October 12, 2015, he examined the Defendant at 6:15 p.m. He stated that generally, nurses treated a patient upon arrival. Although Dr. Hamilton did not have independent recollection of the Defendant's case, he identified his handwritten note in the Defendant's medical record that the Defendant "was restrained and appeared altered." Dr. Hamilton explained that the Defendant was "not acting appropriately," which "could mean a lot of things," including that the Defendant's "level of consciousness was [ab]normal or his interaction with [Dr. Hamilton] might have been abnormal, not answering appropriately, not knowing where he [was]." Dr. Hamilton agreed that an altered state could refer to a patient's mental state.

Dr. Hamilton testified that the Defendant's speech was abnormal and that he was confused. Dr. Hamilton's notes stated that the Defendant "was moving all of his extremities, he had slurred speech, appeared altered, [knew] his name, did not know the

time or the place[,] and he had no recollection of the accident." Dr. Hamilton stated that he had treated "dozens if not hundreds" of patients involved in motor vehicle accidents and had treated patients under the influence "[s]everal times." He stated that his notes about the Defendant's "altered" affect could refer either to intoxication or a head injury. Dr. Hamilton stated that according to the radiology report, the Defendant's CT scan was normal and did not show a severe head or brain injury. He said, though, that a CT scan would not detect a concussion. Dr. Hamilton explained that the symptoms of a concussion were loss of consciousness, being "dazed, confused, inappropriate, not aware of who they are, where they are, don't know their names sometimes, they will sometimes have a headache . . . [or] blurred vision, . . . nausea, symptoms that may even persist for several days after the event." Dr. Hamilton stated that in his experience, combative behavior and yelling were not symptoms of a concussion. He noted that "[s]ubdued, complacent" behavior was more typical of a concussion rather than being "unable to stay still or moving around a lot[.]" Dr. Hamilton did not recall the Defendant's spitting on him or yelling at him; he reiterated that he had "very little recollection" of treating the Defendant.

On cross-examination, Dr. Hamilton testified that a concussion could produce slurred speech, confusion, memory loss, disorientation to place, and altered behavior. He agreed that being ejected from a motor vehicle could cause a concussion and that concussions presented differently depending upon the individual. He acknowledged the possibility that a patient with a concussion could be angry or combative.

On redirect examination, Dr. Hamilton identified a portion of his notes in the Defendant's medical record that read, "He complains of back pain, left knee pain, he has a history of IV drug use." Dr. Hamilton stated that "sometimes [he had] to discern [whether] the IV drug use [was] responsible for certain behavior or . . . [it could] cover up injuries that because of drugs on board would not be apparent[,] so [he had] to take extra care . . . to make sure that [he] uncover[ed] all of their injuries."

TBI Special Agent Joseph Castelbuono, an expert in toxicology, testified that he analyzed the Defendant's blood and urine samples. He noted that he received a serum sample that was too small to be tested. The blood sample was collected on October 12, 2015, at 11:55 p.m., and tested positive for lidocaine, ketamine, and midazolam. Agent Castelbuono noted that the three drugs in combination were "hospital administered drugs." He stated that the Defendant had received a blood transfusion, which would dilute the blood to the point that any drugs present before the transfusion may not have been seen on tests. He agreed that as a result, the Defendant's blood test results did not accurately reflect the contents of his blood at the time of the crash.

Agent Castelbuono testified that the Defendant's urine, which was collected at 7:50 p.m. on October 12, tested positive for amphetamine, methamphetamine, lidocaine, and oxycodone. He stated that amphetamine was a central nervous system stimulant and that

relative to driving, a person could become jittery and more aggressive; the person would also have trouble gauging speed and would feel like he was moving faster than he was. Later, the person would have a "crash" characterized by "extreme fatigue, sleepiness, [and] drowsiness." Agent Castelbuono stated that the "half-life" of a drug referred to the amount of time it took the body to "pass through" half of the drug; after three half-lives, the drug would not be present in a person's body. The half-life of amphetamine was six to fifteen hours, during which a person would feel the effect of the drug.

Relative to methamphetamine, Agent Castelbuono testified that it affected the central nervous system and that the body broke down methamphetamine into amphetamine. He noted that when he encountered both drugs in a person's system, he assumed that the amphetamine "came from" the methamphetamine. The half-life of methamphetamine was also six to fifteen hours. Both methamphetamine and amphetamine could be detected in urine for one to four days, and a "[c]hronic user" could have it in his urine for up to one week. Agent Castelbuono noted that "[i]n the urine there's a lot of variables that affect detection[.]"

Agent Castelbuono testified that oxycodone was a central nervous system depressant that "dull[ed] the senses" and that relevant to driving, it slowed down motor reactions; the ability to "assess a threat"; and "divided attention task[s]" like being able to adjust a radio, focus on other cars, and stay in one's lane simultaneously. The half-life of oxycodone was "roughly" four to eight hours, and it was detectable in urine for twenty-four hours. Depending on an individual's metabolism, oxycodone would begin to be present in urine between thirty minutes and two hours after its ingestion.

Agent Castelbuono testified that the time frame during which drugs were detectable in urine was "a lot larger" than that for blood. He stated that "because of these large ranges," he did not typically quantify the amount of drugs in urine because "it wouldn't be very relevant." In contrast, he generally quantified the amount of drugs found in a blood sample. He stated that the lack of quantification on the Defendant's urine test result did not rule out the possibility that the Defendant was "feeling the [e]ffects" of the respective drugs at the time of the urine sample's collection. Agent Castelbuono stated that it was possible for a person to have oxycodone in his blood and urine simultaneously; for example, if a person had consumed oxycodone one hour before the blood and urine samples were taken. He noted that there were "a lot of variables when it c[ame] to urine, how much [was] consumed, when it was consumed, [the person's] metabolism, [and] whether or not [the person was] hydrated[.]" He agreed that a person could "be feeling the [e]ffects" of oxycodone one hour after it was consumed.

Agent Castelbuono testified that false positives were possible if his instrument's sanitizing equipment malfunctioned and residue from another sample contaminated the sample being tested. He explained that a negative control sample was run with every test

to ensure cross-contamination did not occur. He stated that although amphetamine was present in Adderall, methamphetamine was not.

On cross-examination, Agent Castelbuono testified that the Defendant's blood tested negative for opiates. When asked whether a positive urine test could indicate a "tiny bit" or "a lot" of a drug, Agent Castelbuono stated that the test would register as positive if the urine contained at least one microgram per milliliter. He acknowledged that a positive urine test did not indicate "directly" that the person was under the influence of a drug because the contents of the bladder did not "flow[] through somebody's central nervous system."

When asked whether the similar molecular structures of methamphetamine and amphetamine contributed to false positives, Agent Castelbuono testified, "You wouldn't have a false positive with amphetamine — as far as structure determination goes that has nothing to do with false positives." He acknowledged that it was possible for a person to take "certain drugs" and falsely test positive for methamphetamine. He further acknowledged that based upon the urine test, the Defendant could have ingested methamphetamine as early as October 8, 2015. Agent Castelbuono stated that six hours after ingesting oxycodone, a person "might be feeling a little bit of the [e]ffects . . . . [I]t would be longer than that where [a person] wouldn't be feeling [e]ffects anymore." Agent Castelbuono agreed that he was unable to opine that the Defendant was "impaired" at the time of the accident based solely upon the urine results.

On redirect examination, Agent Castelbuono testified that his laboratory's testing process was "a lot more accurate" than employer or home drug test kits, that his laboratory ran a series of positive controls to enable them to conclude definitively which drug was present in the urine, and that he knew a false positive did not occur in this case. He reiterated that it was possible for drugs to be present in the bloodstream and bladder at the same time. The parties stipulated that the Defendant's blood tested negative for alcohol.

Vanderbilt University Medical Center (VUMC) Registered Nurse Suzanne Campbell and Nurse Hillary Hoffman testified that on October 12, 2015, they administered blood transfusions to the Defendant totaling nine hundred seventy-three milliliters, or about three units of blood. Ms. Campbell noted that the human body generally contained between eight and twelve units of blood in total. The transfusions occurred at 9:15 p.m. and 10:34 p.m.

Tennessee Highway Patrol Sergeant Shawn Boyd testified that he interviewed the Defendant at VUMC on October 14, 2015, after the Defendant waived his rights and agreed to a voluntary interview. The Defendant was unable to write his name at that time. Sergeant Boyd stated that the Defendant was under medical care and had likely received pain medication; nevertheless, the Defendant said that he understood why Sergeant Boyd

was questioning him. Sergeant Boyd noted that the Defendant was not under arrest at the time.

A recording of the Defendant's police interview was played for the jury.[2] In the recording, Sergeant Boyd noted that it was 11:35 a.m. and that the Defendant's mother and sister were present. The Defendant gave his full name and the last four numbers of his social security number. Sergeant Boyd explained the Defendant's right to an attorney and to remain silent, and the Defendant affirmed that he understood his rights, that nobody had made promises or threats toward him, and that he wished to speak to Sergeant Boyd without a lawyer present "for now." The Defendant's mother noted that he had been administered oxycodone at the hospital. The Defendant was somewhat difficult to understand in the recording, but he responded to Sergeant Boyd's questions and gave full answers.

The Defendant stated that on Monday, October 12, 2015, at 5:45 a.m., he arrived at his workplace, where he was a welder. After finishing his shift at 4:00 p.m., he left work and drove toward his mother's house in his 2001 white Dodge truck. When asked whether he had taken illegal drugs that day, the Defendant stated, "No. I didn't have no [sic] money. We didn't get paid [the previous Friday]." He denied having taken drugs on October 11, and he stated that on Saturday, October 10, he took "OxyContin 15." The Defendant noted that he "probably would have gotten something Monday night" after being paid, although he denied being on his way to buy drugs at the time of the crash. He maintained that he was going to his mother's house to do laundry. The Defendant acknowledged that he did not have a prescription for oxycodone.

In the interview, the Defendant denied using his cell phone before the crash for calling or sending text messages; he clarified, though, that he did not remember whether he did so. He did not recall crossing the center line of Highway 13 or leaving Clarksville; his last recollection was cashing his paycheck at Walmart around 4:30 p.m. The Defendant noted that he may have called or sent a text message to a man named Eric when he was going to Walmart to tell Eric he "was on [his] way." The Defendant gave consent for Sergeant Boyd to search his cell phone.

When asked whether "anything" was going to show up in his blood test, the Defendant said, "I mean, I don't know how," and he denied having used any drugs in the past twenty-four hours. He did not remember with certainty the time at which he took the drug between Saturday evening and early Sunday morning and acknowledged that he may have taken the oxycodone early on Sunday morning around 2:00 a.m. The Defendant noted that he spent Saturday night in a Walmart parking lot in his truck because he had not

---

[2] A transcript of the interview was provided to the trial court and the jury, but it was not entered as an exhibit. It was, however, included on the disc containing the interview recording. The disc also contained Mr. Grundy's written police statement, which was not an exhibit at trial and not part of our review.

received his paycheck and could not afford a hotel. The Defendant stated that on Sunday, he slept in his truck for most of the day.

The Defendant stated that on March 20, 2017, in Princeton, Indiana, he was in a car crash caused by his falling asleep. He stated that he had not used drugs and that he had sleep apnea, which was diagnosed after the crash. The Defendant noted that he currently used a continuous positive airway pressure (CPAP) machine at night but that it had not been working correctly and that he only wore it part of the night before taking it off. The Defendant denied using his CPAP machine the two nights before the crash in this case, but he said that he slept well on Sunday night. He agreed that he felt "pretty good" on Monday before the crash.

The Defendant stated that his workplace performed drug testing on new employees, but he was not subject to continuing drug tests. He had only worked for this employer for "a couple of months." When asked how many oxycodone pills he usually purchased, the Defendant said, "Not many because they are too expensive." He noted that the pills he bought were ten dollars apiece and that in the past, he had obtained a higher dosage pill for forty dollars apiece.

Sergeant Boyd opined that the man named Eric was the Defendant's oxycodone supplier. Sergeant Boyd agreed that the Defendant was intending to purchase oxycodone on day of the crash. He stated that thirty-eight hours elapsed between the Defendant's last admitted drug use and the time the Defendant left work on Monday.

On cross-examination, Sergeant Boyd acknowledged that he did not confirm with Walmart the time the Defendant left after cashing his paycheck and that he did not ask the Defendant for Eric's telephone number. Sergeant Boyd noted that the Defendant never provided Eric's last name. He acknowledged that the Defendant was under the influence of oxycodone during the interview. Sergeant Boyd stated that the Defendant was lethargic, cooperative, and not combative; Sergeant Boyd wrote the Defendant's name on the waiver of rights form.

Nashville Medical Examiner's Office Dr. Miguel Laboy, an expert in forensic medicine, testified that he conducted the victims' autopsies in this case. Dr. Laboy concluded that the cause of death of all three victims was multiple blunt force injuries, and the manner of death was "accidental," referring to the fact that the crash was not intentional. Mr. Griggs sustained blunt force trauma, abrasions, and lacerations to the head, causing a subdural hemorrhage between the brain and skull. He sustained blunt force trauma to the torso and extremities, causing multiple rib fractures, some of which punctured the lungs and caused contusions and lacerations; "bilateral hemarthrosis and hemopericardium," meaning blood accumulated in the chest cavity around the lungs and between the heart and the pericardial sac; a laceration to the heart; lacerations to the liver and spleen; a fractured

pelvis; fractured legs and right arm; and other abrasions and lacerations. Dr. Laboy agreed that the crash was "absolutely for sure" the cause of death.

Relative to the infant victim, Dr. Laboy testified that she sustained blunt force trauma to the head, neck, and extremities. She suffered fractures to her skull, which appeared to be "depressed," her cervical vertebrae, and both femurs, as well as a subdural hemorrhage over the brain. Dr. Laboy agreed that the cervical vertebrae fractures could be caused by a sudden stop while an infant was secured in a car seat.

Relative to Ms. Leonard, Dr. Laboy testified that she sustained blunt force trauma to the head and torso, causing skull fractures, a subdural hemorrhage, rib fractures, contusions to the lungs, lacerations of the liver and spleen, a hemorrhage caused by a pelvic fracture, bilateral hemarthrosis, a fractured left leg, and abrasions and lacerations to various parts of the body. Dr. Laboy affirmed that Ms. Leonard's toxicology screen was positive for alcohol; the report indicated that her blood contained twenty-one milligrams per deciliter, which Dr. Laboy confirmed was equivalent to a blood alcohol content of 0.021. He noted that he collected blood from Ms. Leonard's open chest cavity rather than a vein, as well as "vitreous fluid" from her eye. Dr. Laboy explained that vitreous fluid was "more pristine," that due to the injuries in this case the blood was not "sealed" in the same way as vitreous fluid, and that the bacteria in the body cavity could have produced ethanol as a byproduct of the decomposition process. Dr. Laboy noted that Ms. Leonard's autopsy occurred two days after her death and that her vitreous sample tested negative for alcohol. He opined that given the negative vitreous sample, the positive alcohol blood test was "[m]ost likely" due to bacteria growth. On cross-examination, Dr. Laboy acknowledged that tan fluid was present in Ms. Leonard's stomach and that he did not know if alcohol was present in the stomach. On redirect examination, Dr. Laboy stated that two days after death, he would also expect to find ethanol in the stomach due to bacteria growth.

At the close of the State's proof, the Defendant made a motion for judgment of acquittal relative to Counts 1, 2, and 3, arguing that the evidence was insufficient to support a finding of intoxication. The trial court denied the motion, and the Defendant did not present any proof.

During the State's rebuttal argument, the prosecutor discussed ways in which the Defendant "hid[] the truth" during the trial. The prosecutor gave as examples defense counsel's stating during opening argument that Ms. Leonard was highly intoxicated, when in fact her blood alcohol content was one-fourth the legal limit and could have been caused by decomposition, as well as counsel's arguing the possibility of false positive test results when Agent Castelbuono's testimony eliminated the possibility of a false positive. The prosecutor emphasized that circumstantial evidence established the Defendant's intoxication — his behavior at the hospital, admitted prior drug use, and lack of candor with nurses about having been prescribed oxycodone. The prosecutor continued, "Here is

some more circumstantial evidence. The [D]efendant as he sat and as he sits today has still not acknowledged — has still not acknowledged to you that he is using methamphetamine."

Defense counsel requested to approach the trial court, and a sidebar conversation was held off the record. The trial court then stated to the jury, "Ladies and gentlemen, you will disregard that last comment. The General is going to rephrase that. As you . . . heard in the instructions[,] the [D]efendant does not have to present any proof and does not have to testify[.]" The prosecutor continued to argue that "when questioned at the hospital . . . [and by] Trooper Boyd, the [D]efendant never stated that he took methamphetamine, never; but we know he did[.]"

During jury deliberations, the jury submitted a question to the trial court "about being a hung jury in some parts."[3] The court directed the jury that it was to consider the charged offense in each count first and that if reasonable doubt existed, it was to proceed to consider lesser-included offenses.

The jury submitted a second question to the trial court, indicating that a juror "may find it difficult to pass judgment, may request an alternate juror." The court noted that the two alternates had already been excused. The court asked the jury foreman whether the jury had been able to reach a unanimous verdict on "any of these charges." The foreman responded, "I don't want to say yes or no, but it's a little difficult." He stated that the jury "would like to try again." The court asked the foreman whether further deliberation would assist the jury in obtaining a verdict, and the foreman answered affirmatively. The foreman asked whether reconvening in the morning would "cause anything detrimental." The court stated that the jury had "all the time in the world" and that the jurors should feel "no pressure." The court asked for a "show of hands" as to whether the jurors wanted to break for the evening and whether anyone felt he or she would not be able to reach a unanimous verdict. After the jury returned to the jury room for fifteen to twenty minutes, they returned a verdict of guilty on all counts.

At the sentencing hearing, Tammy Leonard,[4] Ms. Leonard's mother and the infant victim's grandmother, gave a victim impact statement. Tammy stated that Ms. Leonard and Mr. Griggs had a surviving three-year-old son, who was living with Tammy and her husband at the time of the accident due to Ms. Leonard's age at his birth and the young couple's needing to "get[] their lives together." Ms. Leonard and Mr. Griggs both worked full time, with Mr. Griggs being about to start his third full time job, and the couple was expecting to have their son live with them in the near future. She noted that the Defendant

---

[3] Although the trial court stated that it was placing the written jury question into the court file, it is not part of the record on appeal.

[4] Because Ms. Leonard and Tammy Leonard shared a surname, we will refer to Tammy by her first name for clarity. We intend no disrespect.

had "an extensive criminal background" and that it did not appear that he "ever had any substantial consequences to [deter] his behavior[.]"  Tammy stated,[5]

> The [D]efendant does not appear to have any regard for the lives of others.  His only concern is his own.  This was obvious by his behavior during every court appearance, as well as during the trial.  He was seen smiling, laughing, and joking with his family and his attorney an innumerable amount of times - as if there was something funny about what was happening and what he had done . . . . I have not seen the [D]efendant show so much as an ounce of remorse for causing the deaths of three human beings . . . . Remorse is something you feel, but it is also something others can see[,] and he has none.  However, I do anticipate he will put on a good act at his sentencing [i]n hopes of receiving a lighter sentence.

> . . . .

> Your Honor, the [D]efendant is a menace to society and if he is not given the maximum sentence he will continue to put innocent people in danger and he will likely kill again.

Gary Joe Leonard, Ms. Leonard's father and the infant victim's grandfather, also gave a victim impact statement in which he described the devastating impact the victims' deaths had on his family, particularly on Ms. Leonard's young son.  Mr. Leonard noted that "the whole trial seemed like a joke to [the Defendant] and his family[.]"  He asked the trial court to impose the maximum sentence.

Heidi Sensing, a family friend of the Leonards, also testified regarding the effect of the victims' deaths on the Leonard family.  Ms. Sensing noted that she attended every court appearance and that she had not "seen one ounce of remorse in that man at all."  She requested that the trial court impose the maximum sentence.

Tennessee Department of Correction (TDOC) probation officer John McGranahan testified that he composed the presentence report in this case.  He stated that the Defendant had an "extensive" criminal history.  Mr. McGranahan noted that the Defendant was on probation at the time of the crash in this case.

The presentence report reflected that Defendant was thirty-eight years old and that he reported having graduated high school; however, Mr. McGranahan confirmed that the Defendant lacked one credit and did not graduate.  The Defendant denied having

---

[5] A page is missing from the sentencing hearing transcript at this point in Tammy's testimony in both the physical and electronic copies.  However, Tammy's written statement was exhibited to the hearing, and it appears that she did not deviate from it.

experienced any sort of abuse as a child. The Defendant reported drinking alcohol socially from ages fifteen to thirty-four; using marijuana from age fourteen until 2004, when his daughter was born and his employer began drug testing employees; and using methamphetamine "a couple of times" or "five times" from age nineteen until "between October 9, 2015 - October 12, 2015." The Defendant noted that he did not like the effects of methamphetamine because it kept him awake, he could not eat, and it "confuse[d his] mind." However, the Defendant used methamphetamine to "get charged" during periods when he had to work twelve-hour shifts seven days per week. Mr. McGranahan wrote that the Defendant "noted that this was the situation at the time of the collision," that the Defendant had not had a day off in two months, that he worked ten hours the day of the crash, and that he used methamphetamine the Thursday before the crash.

Relative to oxycodone, the Defendant reported to Mr. McGranahan that he was prescribed pain medication for two years due to a ruptured disc in his back; afterward, he was prescribed oxycodone for three years and became addicted. After "the laws tighten[ed] on the dispensing of pain medications," the Defendant began buying oxycodone on the street from different individuals. The Defendant explained that "he would be on the road" ten to twelve hours per day and "would be a long ways from his doctor." The Defendant reported taking a "couple of oxy" daily. The Defendant acknowledged taking oxycodone "the day before the October 2015 collision (on a Sunday)." The Defendant further disclosed that at the time of the crash, he was heading to his mother's house in New Johnsonville and "to get more pills." The presentence report indicated that the Defendant "did admit that he had taken OxyContin 15 approximately [twenty-four to forty-eight] hours before the collision."

The Defendant declined to give Mr. McGranahan his version of events regarding the crash. When Mr. McGranahan inquired about the Defendant's feelings related to the crash, the Defendant responded that "he ha[d] to think about it and live with it everyday [sic], but d[id] not like to do so. [The Defendant] stated that he [thought] about how he should have done things differently, not gone [to] his mother's house. He stated that he [thought] about those kids who were kill[e]d, and how those kids were about the same age as his own kids." The Defendant did not wish to discuss the subject further. The presentence report stated that the Defendant's Strong-R assessment scored him as a "moderate" risk to reoffend; recommendations included "pro-social life skills," drug treatment, and obtaining a GED.

Relative to the Defendant's criminal history, in addition to the convictions in this case, the presentence report reflected several incidents of criminal conduct. Mr. McGranahan noted two felony convictions and thirty-four misdemeanor charges, twenty-five of which were traffic related.

On October 7, 1998, the nineteen-year-old Defendant was convicted of "driving while impaired" (DWI) in Benton County, Tennessee. The Defendant had previous speeding convictions in Humphreys County, Tennessee; Muhlenberg County, Kentucky (two convictions); Hopkins County, Kentucky; and Boone County, Kentucky. He had convictions in Christian County, Kentucky for "no exterior ID/improper display" and violation of "Part 391 of federal safety regs - Qualification of drivers." He had an additional conviction in Hopkins County, Kentucky for failure to produce an insurance card and in Muhlenberg County, Kentucky for "improper equipment." In 2013, the Defendant was convicted in New Johnsonville, Tennessee of driving without a license, and in Benton County, Tennessee of driving with a suspended license and violation of the registration law.

The Defendant also had two 1999 convictions in Benton County, Tennessee, for simple possession of marijuana and simple assault. The Defendant was convicted of hunting-related offenses in 2003 in Ohio County, Kentucky, and in 2012 in Humphreys County, Tennessee.

Relative to felony offenses, on August 4, 2010, the Defendant was convicted in the Franklin, Wisconsin Municipal Court of "retail theft - intentionally take (<$2,500); Guilty; Balance due $569.00."[6] A copy of the conviction for retail theft was admitted as "reliable hearsay," even though it was not a certified copy, and reflected that the Defendant pled guilty and was ordered to pay $669 restitution, of which he had paid $100. On April 25, 2015, the Defendant was convicted in Christian County, Kentucky of "[c]arrying a concealed deadly weapon," failure to produce an insurance card, and failure to maintain required insurance. The Defendant was sentenced to two years unsupervised probation.

The presentence report further listed several dismissed charges in Kentucky and Tennessee for two instances of assault, failure to produce an insurance card, domestic violence, two instances of failure to wear a seat belt, having expired registration plates and registration receipt, speeding ten miles per hour over the speed limit, entry on land to hunt without consent, misdemeanor theft, reckless driving, and three instances of driving with a suspended license.

The presentence report noted that the Defendant had a pending failure to appear charge in Humphreys County, Tennessee, which was related to the 2013 driving with a suspended license charge in New Johnsonville. In addition, the prosecutor and the Defendant's mother confirmed that on March 20, 2007, the Defendant was driving near Princeton, Indiana when he fell asleep, crossed the center line, and hit three cars; the Defendant's passenger was killed, but no drugs or alcohol were involved and no criminal charges were ever filed.

---

[6] The Defendant was originally charged with "Theft of property - $1,000 - $10,000."

-16-

Mr. McGranahan testified that the Defendant had been arrested or cited thirty-six times in total. When Mr. McGranahan asked the Defendant about the 1998 DWI incident, the Defendant stated that "he was with a couple of friends in a vehicle" but that the Defendant was not driving. The Defendant admitted that he had been drinking and that they had used marijuana; he told Mr. McGranahan that "[n]o one claimed responsibility to be the driver [and] so because it was his vehicle[,] he was charged with the DWI." Mr. McGranahan confirmed that the Defendant had been convicted of DWI and still would not admit he was guilty.

Defense counsel objected to the admission of the presentence report as an exhibit, arguing that it incorrectly characterized the Defendant's felony convictions, which counsel contended were misdemeanors. Relative to the Kentucky firearms conviction, counsel stated that it related to the Defendant's "riding in a car" with a concealed gun, that at the time, the behavior was equivalent to a Tennessee misdemeanor; and that by the time of the sentencing hearing, the conduct was legal in Tennessee. The trial court responded that the report indicated that the Defendant was sentenced to two years of probation, "and here that would be a felony if it was a two[-]year sentence."

On cross-examination, Mr. McGranahan agreed that the Defendant was cooperative and reviewed his criminal history with Mr. McGranahan to the best of his recollection. Mr. McGranahan acknowledged that some of the charges included in the presentence report were dismissed and that the Defendant was presumed innocent of those charges. Mr. McGranahan spoke to an officer with the Kentucky Board of Probation and Parole, who indicated that the Defendant was not under supervision there and that because the Defendant was unsupervised, no probation violation would be filed as a result of this case. Mr. McGranahan did not find any other instances in which the Defendant failed to comply with the terms of a probationary sentence.

Mr. McGranahan agreed that the Defendant had a "lengthy" history of illegal drug use and that the Defendant detailed exactly what he had consumed and when in the time period leading up to the crash. The Defendant had generally been employed as a welder during adulthood, although Mr. McGranahan was not able to verify any of his work history.

Certified copies of the 1998 DWI conviction, the 2015 Kentucky conviction for "carrying a concealed deadly weapon," and several other of the Defendant's convictions were entered as a collective exhibit.

The State further submitted a collection of indictments from vehicular homicide cases involving multiple defendants in Houston, Cheatham, Dickson, and Humphreys Counties in Tennessee. Defense counsel objected, stating that the disposition of the cases was not evident. The trial court allowed the indictments "for purposes of just argument[.]"

Valerie Fuller, the Defendant's mother, testified on his behalf, conveying her sympathies to the victims' families. She stated that the Defendant's twenty-seven-year-old aunt was killed by a drunk driver, that the Defendant's uncle and father figure died in a hunting accident, and that the Defendant was in an accident ten years previously in which his best friend died.[7] She said that the Defendant began taking pain medication for a back injury and that he abused the medication out of grief. Ms. Fuller stated that the Defendant was a good father to his children and urged the victims' families to forgive him.

Seventeen-year-old B.G.,[8] the Defendant's ex-wife's daughter, testified that her father died when she was young and that the Defendant raised her. B.G. referred to the Defendant as her father. She expressed her regret at the victims' families' loss and stated that her family had experienced a loss as well, although it was not the same. She noted that her twelve-year-old sister "was here last time"[9] and that "[n]o child should be here for a case like this or at all. This shouldn't be what we have to go through."

The Defendant presented an unsworn statement. He asked for the victims' families' forgiveness and stated that he would "spend the rest of [his] life with the guilt [he had] for this accident[.]" He said he was "truly sorry" for "all of the bad decisions [he had] made." The Defendant stated that his children were "suffering greatly from the event, that accident, and [his] decisions." He noted that he would miss his children's graduations, that his father was in poor health and might not be able to see him released from prison, and that he prayed his eighty-five-year-old grandmother would be there when he was released.

Relative to the presentence report, the trial court noted for the record that the Defendant had waived the timeliness of the presentence report and that there had been an administrative issue with completing the report. Defense counsel noted that Mr. McGranahan "did the best [counsel had] every [sic] seen on a presentence report" and that counsel had "never seen a presentence report that extensive."

The trial court noted that it was "not going to give a lot of weight to" the number of indicted vehicular homicide cases in its judicial district. The trial court stated that this case was "very sad" and "probably one of the worst vehicular homicide cases" the court had encountered in twenty-five years as a prosecutor and a short tenure as a judge. The court noted that it had watched the Defendant during trial and "in watching him kind of agree[d] with the victim's family . . . I did not see . . . too much remorse in him." The court further noted that it did not see the Defendant express remorse in the presentence

---

[7] A news article attached to the presentence report indicated that this was the Princeton, Indiana crash.

[8] It is the policy of this court to refer to minors by their initials.

[9] It was unclear to what B.G. was referring.

report and that the sentencing hearing was the first time the court had heard the Defendant say the words "I'm sorry."

The trial court found that based upon the evidence at trial, it was "quite apparent" that the Defendant was under the influence. The court noted that in the presentence report, the Defendant had not acknowledged he was under the influence, "similar to the statement . . . that he wasn't guilty of" the prior DWI. The court found that the Defendant did not show that he believed he had a drug problem or that he wanted to "get rid of that problem."

The trial court stated that it considered the evidence at trial and the sentencing hearing, the presentence report, the principles and purposes of sentencing, the arguments as to alternative sentencing, the nature of the criminal conduct, the arguments of counsel relative to enhancement and mitigating factors, the Defendant's statement, and his potential for treatment and rehabilitation. The court found that the Defendant was a Range I, standard offender and that the respective sentencing ranges for vehicular homicide by intoxication and vehicular homicide by recklessness were eight to twelve years and three to six years.

Relative to enhancement factors, the trial court found that the Defendant had a previous history of criminal convictions or criminal behavior and gave "great weight" to that factor. See Tenn. Code Ann. § 40-35-114(1). The court noted that misdemeanor convictions could be considered as well as felonies. The court found that beginning at age nineteen, the Defendant had "almost a constant arrest or citation" record; relative to the traffic offenses, the court found that "it's an indication to [the court] that this [D]efendant is going to do whatever he wants." The court noted the Defendant's previous hunting-related violations and stated that the Defendant was "not going to do anything that any authorities are going to tell him[.]" The court also found that the Defendant did not take responsibility for his previous DWI conviction and gave weight to that fact. The court further found that the Defendant did not "seem to want to take much responsibility" for the crash in this case by denying he took drugs close to the time of the crash and gave that fact "great weight."

The trial court found that the Defendant failed to comply with the conditions of his probation and that the offense was committed while the Defendant was on probation. See Tenn. Code Ann. § 40-35-114(8), (13)(C). The court considered that the Defendant's previous convictions had not "seem[ed] to deter him."

The trial court found that relative to the vehicular homicide by intoxication convictions, the Defendant had no hesitation about committing a crime when the risk to human life was high; however, it gave "a little weight to that, not too much[.]" See Tenn. Code Ann. § 40-35-118(10). The court noted that the Defendant had admitted to using methamphetamine five times in his life so that he could stay awake and go to work, but

-19-

that the Defendant had conveyed that he did not like the effects of the drug.   The court commented,

> So if I am to believe him that he used this drug a day or two before and he worked and he stayed up all during this time, he should have known at that point in time that he wouldn't be fit to drive.   Anybody that stays up even if they don't take a drug[,] they're not fit to drive.   So I'll give a little bit of weight to that but not too much weight.

The trial court declined to apply any mitigating factors and found that "none whatsoever" existed.   The court noted that although it sympathized with the Defendant's family, the Defendant was not relieved of "his responsibility for creating this problem."   The court continued,

> We live in a society today where it seems that people no longer want to be responsible for their actions.   So let me make it real clear to you, your actions are the reason why we're here.   Not because of anything that happened to you as a youth, not because, you know, you wanted to work.   It happened because you consistently flaunt authority.   You're going to do what you want to do; and we're here today basically because you wanted to get that paycheck cashed and you wanted to get to New Johnsonville so you could buy you some more pills. That's what your statement was, if I remember correctly.   And that's a sad - sad thing.   That's the only reason why you were on that road is to get to New Johnsonville to buy pills; and that's the reason that this family over here no longer has a daughter or a son or granddaughter and this [c]ourt does not feel that that has sunk into you.

Relative to consecutive sentencing, the trial court found that the Defendant's record of criminal activity was extensive and noted that the Defendant had received a citation or was arrested every year, aside from one, beginning when he was nineteen years old.   See Tenn. Code Ann. § 40-35-115(b)(2).   The court also found that the Defendant was on probation when he committed the offenses and that although "that's usually confined to running it consecutive to the probation,"[10] the court only needed to find one factor applied to order consecutive sentences.   See id. § 40-35-115(b)(6).

The trial court remarked that although the Defendant had expressed remorse in his prepared statement, the Defendant "ran [the victims] over," and the court had not "seen

---

[10] We note that the trial court was mistaken; factor (6) may be properly applied to order consecutive service of multiple counts of offenses in the same case and not only consecutive service with the sentence that was previously suspended to probation.   See, e.g., State v. Franklin, 919 S.W.2d 362, 367-68 (Tenn. Crim. App. 1995) (concluding that consecutive sentencing on multiple counts of forgery was proper, in part, because the defendant was on probation at the time the offenses were committed).

remorse until [the Defendant] stood up today and said that[.]" The court noted that it did not believe that the Defendant "had much remorse in this."

Relative to the Defendant's drug use, the trial court commented it believed the Defendant "probably" stopped using marijuana because his employer began drug testing. The court found that after using methamphetamine "and staying up and working and all that stuff, again [the Defendant] decided to get behind the wheel because [he] wanted to get to New Johnsonville to get those pills." The court noted the Defendant's statement in the presentence report that he had not had a day off from work in two months, that he had used methamphetamine the Thursday prior to the crash, and that he had worked ten hours on the day of the crash. The court considered these facts and found that the Defendant "had no hesitancy about driving that vehicle when [he] should have known that [he was] too impaired to drive[.]" The court found that based upon the Defendant's social and criminal history, he was "basically . . . going to do whatever [he wanted] to do." The court stated that "[a]t one point [the Defendant] want[ed] to say, well, I have a drug problem; but it's not really that bad." The court again found that the Defendant had not taken responsibility.

Relative to the circumstances of the offense, the trial court found that a young couple and a two-week-old baby were no longer "here" because of the Defendant's decisions. The court found that this offense was "worse than any other offense" it had seen because the Defendant had not fully taken responsibility for it and the only reason the Defendant was on the road at that location was because he "was hot footing it to New Johnsonville to get some more pills."

Relative to the Defendant's potential for rehabilitation, the trial court found that the best drug rehabilitation programs would not help the Defendant if he did not "want to change or if [he did not] think [he had] a problem . . . and [the court did not] think [the Defendant had] gotten there." The court found that based upon the Defendant's arrest record and previous probation, the Defendant was "[d]efinitely" not going to abide by any terms set by the court.

Relative to society's interest in being protected from the future criminal conduct, the trial court found that the interest was "great" and that it was "extremely likely" the Defendant was going to commit more criminal offenses because the court had "not seen anything that would convince" the court that the Defendant was going to "do anything other than what [his] history show[ed]" he had done. The court noted that probation "certainly [did not] seem to get [the Defendant's] attention."[11]

---

[11] The trial court made further findings regarding alternative sentencing, but the Defendant does not raise the denial of probation on appeal.

The trial court sentenced the Defendant to twelve years each in Counts 1, 2, and 3, to be served consecutively. The court sentenced the Defendant to six years each in Counts 4, 5, and 6, and merged Count 4 with Count 1; Count 5 with Count 2; and Count 6 with Count 3, for a total effective sentence of thirty-six years. Without making further findings, the court ordered the Defendant's driver's license to be suspended[12] for ten years.

## ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred by admitting the TBI blood and urine test results; (2) the trial court erred by admitting photographs of the victims at the crash scene; (3) the evidence was insufficient to prove intoxication; (4) the trial court erred by denying the Defendant's motion for a mistrial during the State's rebuttal argument; and (5) the trial court erred by imposing the maximum in-range sentence, ordering consecutive sentencing, and suspending the Defendant's driver's license for ten years.[13,14] We will examine each in turn.

### I.    TBI Test Results

The Defendant contends that the trial court erred by admitting the results of his urine test, arguing that the test was inconclusive and that the probative value of the evidence was outweighed by the risk of unfair prejudice. The Defendant does not characterize his issue as one involving a motion to suppress evidence, but rather bases his argument on Tennessee Rules of Evidence 401 and 403. The State responds that the evidence was properly admitted.

The Defendant filed a June 17, 2016 pretrial motion to "preclude the introduction of TBI test results from [the] blood draw of the Defendant." The motion raised the relevancy of both the blood and urine test results, arguing that the tests were "vague and inconclusive of the [D]efendant's alleged impairment[.]" The Defendant noted that the urine test reflected only positive or negative results, not the amount of any substance; he further noted Agent Castelbuono's preliminary hearing testimony that he was unable to determine whether the Defendant was impaired based upon the urine test. As a result, the

---

[12] Although the trial court and the parties characterize this order as revoking the Defendant's driver's license, this court has previously discussed that the prohibition against driving pursuant to the vehicular homicide statute "is a suspension of driving privileges," whereas action taken by the Tennessee Department of Safety against a driver convicted of vehicular homicide pursuant to Code section 55-50-501(a)(1) is a revocation. State v. Tamela T. Scott, No. M2006-02067-CCA-R3-CD, 2008 WL 4253722, at *24 (Tenn. Crim. App. Sept. 17, 2008) (citing State v. Kevin Lee Pennell, No. M2001-01863-CCA-R3-CD, 2003 WL 1960272, at *1-3 (Tenn. Crim. App. Apr. 28, 2003) (contrasting judicial license suspension and administrative license revocation)). We will, therefore, refer to the suspension of the Defendant's driver's license.

[13] We have consolidated the Defendant's sentencing issues for efficiency.

[14] We note that the motion for a new trial hearing transcript is not included in the record, and the trial court's written order does not contain findings of fact.

Defendant averred that the test results would not substantially assist the jury and were so unreliable as to be irrelevant.

At a September 19, 2016 pretrial hearing, Agent Castelbuono testified consistently with his trial testimony. He also stated that when a person used methamphetamine, relevant to driving, the person could "weave in and out of traffic, . . . have trouble gauging how fast [the person was] going versus everybody else, [and the person was] more likely to swerve around individuals[.]" When a person "c[a]me off the drug," the person would experience a "crash" or withdrawal effect characterized by "extreme fatigue," which could lead to uncontrollable drowsiness and falling asleep. Agent Castelbuono testified that the presence of a drug in a person's urine did not eliminate the possibility that the person was under the influence of the drug.

On cross-examination, Agent Castelbuono testified that a person would not test positive for methamphetamine after ingesting Adderall. He acknowledged that "very rare drugs" could generate a false positive urine test for methamphetamine. Agent Castelbuono stated that he would "suspect" a person was no longer under the influence of a drug once it was "in [his] bladder." He clarified that he did not know whether the Defendant was under the influence based upon the urine results.

Dr. Hamilton testified consistently with his trial testimony, including that based upon his experience, the Defendant's behavior at the hospital could be attributed either to drug or alcohol use or a head injury, that the CT scan revealed no brain or skull injury, and that concussions did "[n]ot necessarily" appear in a CT scan. He agreed that slurred speech and disorientation could be caused by a concussion and that a person could sustain a concussion during a head-on traffic collision.

The trial court orally denied the motion; in a September 28, 2016 written order, the court found that the test results were relevant and that the trier of fact would determine the weight of the evidence at trial.

Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. The admissibility of evidence pursuant to these rules "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997)).

The Defendant argues that this court's opinion in <u>State v. Albert L. Norton</u>, No. 03C01-9707-CR-00270, 1999 WL 508654 (Tenn. Crim. App. July 20, 1999), supports his position. In <u>Norton</u>, a police officer observed the defendant's swerving left of center on multiple occasions and striking a curb while making a left turn. <u>Id.</u> at *1. The officer stopped the defendant, who had bloodshot eyes and smelled of alcohol; the defendant staggered upon exiting the car and fumbled with his wallet; he admitted to drinking beer and taking prescribed pain medication; and he failed a horizontal gaze nystagmus test and field sobriety tests. <u>Id.</u> TBI blood tests revealed specific amounts of various prescribed medications; relevant to this case, it also listed "less than .1 micrograms per milliliter" cocaine. <u>Id.</u> at *2. At a jury-out hearing, an expert witness elaborated that the blood test also contained a significant amount of cocaine metabolite, but the State did not elicit this information in its proof. <u>Id.</u> The expert only testified regarding the general effects of cocaine and the positive result of less than .1 microgram per milliliter. <u>Id.</u> at *7.

On appeal, the defendant argued that the cocaine result was irrelevant and "not supported as scientific evidence" because the level of the drug was too low to be quantified. <u>Id.</u> at *5. This court concluded that "this information <u>alone</u> would have been an insufficient basis for an expert concluding that the presence of cocaine was meaningful in this DUI case." <u>Id.</u> at *7. This court noted that the admission of the full testimony, as contained in the jury-out hearing, was proper because the expert had based her opinion upon the presence of the cocaine metabolite, which "boosted the relevancy value of the unquantified level of unmetabolized cocaine." <u>Id.</u> at *8. This court further noted that it "may have been error to allow this testimony in this incomplete form" but concluded that the defendant had waived the issue by failing to object. <u>Id.</u> This court stated, "Had the cocaine at less than .1 microgram per milliliter been the only cocaine substance found, the evidence of it might well have been irrelevant . . . or prohibitively prejudicial." <u>Id.</u> However, because the full testimony was more damaging to the defendant than the partial testimony, this court concluded that any error in allowing the partial testimony "to be received without curative action" was harmless. <u>Id.</u>

This case is distinguishable from <u>Norton</u> because the Defendant's urine screen results were positive for one illegal substance, methamphetamine, its metabolite, amphetamine, and oxycodone, a controlled substance the Defendant admitted abusing and for which he did not have a prescription. The <u>Norton</u> defendant did not admit to any illicit drug use. Further, Agent Castelbuono stated that a positive test indicated <u>at least</u> one microgram per milliliter of a drug, as opposed to the test in <u>Norton</u>, which only gave an upper threshold. Agent Castelbuono acknowledged that he could not opine as to the Defendant's being under the influence based solely on the urine test; rather, he explained for the jury the general physical effects of the drugs and the time period in which they could be found in a person's urine.

-24-

The record reflects that the urine test results were properly admitted. The presence of illegal substances in the Defendant's urine was relevant to intoxication as well as to impeach the Defendant's police statement that he had not taken any drugs other than oxycodone for one week and had not taken oxycodone since the previous Sunday morning.

We note that a more recent opinion of this court upheld the admissibility of similar TBI blood test results for "bath salts," which did not quantify the drug. State v. Travis Wilson, No. E2013-00371-CCA-R3-CD, 2014 WL 3817074, at *11-12. In that case, the expert witness also testified about the general effects of the drug and acknowledged that she could not "say how profound that effect was." Id. at *12. The expert noted, however, that if a drug was detectible in one's system it was "acting . . . in one way or the other." Id. Although the urine results in this case were not as "highly relevant" as the blood test results in Wilson, the probative value outweighed the danger of unfair prejudice. The Defendant's argument goes to the weight of the evidence and not its admissibility.

We further note that this court "has previously upheld a finding of intoxication where there was evidence of the use of an intoxicant and impairment but no evidence of the quantity of the intoxicant." State v. Johnny Morgan Dye, No. M2018-01191-CCA-R3-CD, 2019 WL 5172275, at *7 (concluding that intoxication was sufficiently proven even though the quantity of hydrocodone and amphetamine was undetermined; blood test results were positive for both substances, but the defendant was seen driving erratically, the defendant lied to medical staff and police about his drug consumption and instructed his wife to retrieve a bag containing syringes from his vehicle, and the defendant admitted to using heroin); see State v. Michael James Amble, No. E2016-02495-CCA-R3-CD, 2018 WL 1989632, at *4 (Tenn. Crim. App. Apr. 27, 2018) (concluding that officer's testimony that the defendant smelled of alcohol, that his speech was slurred, that his eyes were bloodshot, and that he performed poorly on field sobriety tests was sufficient to support conviction); State v. Johnathan Christopher Carey, No. M2014-02373-CCA-R3-CD, 2015 WL 8482746, at *11 (Tenn. Crim. App. Dec. 10, 2015) (concluding that the smell of alcohol and the defendant's erratic driving, slurred speech, and confusion sufficiently supported the conviction when the defendant intentionally blew improperly into the breathalyzer). As we concluded above, the evidence was sufficient to establish intoxication.

Although, as the Defendant notes, the trial court commented on its initial impression of the test's admissibility before hearing the evidence, the record reflects that the court considered the testimony, made findings of fact, and concluded that the urine test was relevant. Moreover, the jury heard a substantial amount of expert testimony regarding the limitations of urine tests and the conclusions that could reasonably be made using them, and defense counsel effectively cross-examined Agent Castelbuono and highlighted the

weaknesses in the evidence during closing arguments. The trial court did not abuse its discretion by admitting the urine test, and the Defendant is not entitled to relief on this basis.

*II.        Crash Scene Photographs*

The Defendant contends that the trial court erred by admitting two photographs of the deceased victims at the crash scene, arguing that the information conveyed by the photographs could have been proven by first responder testimony and that the photographs were highly inflammatory and graphic. The State responds that the photographs were not overly gory or horrifying such that they would have been prejudicial.

The Defendant filed a June 16, 2016 pretrial motion requesting that the trial court determine the admissibility of any crash scene photographs the State intended to introduce. Judge George C. Sexton[15] conducted a February 8, 2017 hearing on the Defendant's motion. The Defendant argued that no photographs of the deceased victims were admissible because it was undisputed that the victims were deceased, that other witnesses would establish the location of the victims' bodies and the circumstances in which they were found, and that the medical examiner would testify as to their causes of death. The Defendant averred that the trial was "already going to be emotional" and that "these pictures only exacerbate that feeling to the jury[.]" Particularly, the Defendant argued strenuously against the inclusion of photographs of the infant victim.

The State responded that the position of the victims' bodies was important because Ms. Leonard had a blood alcohol content of 0.21[16] and that the State wanted to present proof that Mr. Griggs was driving at the time of the crash. The State presented six photographs for the court's consideration. The first photograph depicted the victims' Saturn sedan but did not show which victim was driving. The second photograph showed Mr. Griggs and Ms. Leonard as they were found in the driver's seat and the backseat, respectively. The third photograph was similar to the second. The fourth photograph showed the infant victim, who had suffered a head injury, in a car seat placed on the ground outside of the sedan; the State noted that Mr. Grundy had removed the infant victim from the sedan in an attempt to render aid. The fifth photograph was similar, but the infant victim's head and torso had been covered by a blanket. The sixth photograph showed a different angle of the infant victim's location outside the sedan, and she was not covered.

---

[15] A reference was made at trial to Judge Lockert-Mash's having been on medical leave at the time of the pretrial hearing.
[16] The testimony at trial indicated that Ms. Leonard's blood alcohol content was 0.021, not 0.21; we assume that the State made a mathematical error during its argument.

Judge Sexton found that photographs number four and six depicting the infant victim were inadmissible because the danger of unfair prejudice outweighed the probative value. He determined that photographs one, two, three, and five were admissible; he noted that the jury sometimes raised issues "on [its] own" and that it was important for the State to prove the driver of the victims' sedan.[17] At trial, the State introduced photographs one, two, and five as exhibits.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 594 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. Id. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id. at 949; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985). Crime scene photographs of a victim tend to be prejudicial by nature, but this fact does not make them excludable per se. State v. Jordan, 325 S.W.3d 1, 86 (Tenn. 2010).

The trial court, as represented by Judge Sexton, carefully considered the emotional nature of the photographs of the infant victim and, in fact, excluded two of them. The photograph of the infant victim admitted at trial was not gruesome; the infant victim's head injuries and most of her torso were not visible, and only a tiny quantity of blood was present on one arm. Likewise, the photographs of Mr. Griggs and Ms. Leonard did not show the extent of their injuries; they were barely visible in one of the photographs, and other than the mere presence of blood, the closer photograph showing their respective locations in the sedan was not gruesome or gory.

We acknowledge that the youth of the three victims in this case, as well as their familial relationship, was distressing; however, the photographs did not build on that sentiment beyond what was intrinsically present in the facts of the offense. We note that in opening arguments, defense counsel drew attention to Ms. Leonard's having been "highly intoxicated" and that although he also described her as having been a passenger, the State was entitled to establish through photographic evidence that Ms. Leonard was not driving in order to avoid jury confusion. The trial court did not err by admitting the photographs, and the Defendant is not entitled to relief on this basis.

---

[17] Judge Sexton also issued a written order on February 22, 2017, summarizing his findings.

## III. *Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to support the jury's verdict relative to intoxication.[18] The State responds that the evidence was sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

---

[18] The Defendant's appellate brief challenges the sufficiency of the evidence relative to all convictions in the issue heading, but the body of the argument only discusses proof of intoxication. At oral argument, defense counsel clarified that the Defendant was not contesting the sufficiency of the evidence relative to his convictions for vehicular homicide by reckless driving.

Vehicular homicide, in relevant part, is "the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [t]he driver's intoxication[.]" Tenn. Code Ann. § 39-13-213(a)(2). A driver's intoxication may be caused by either alcohol or drugs and includes any substance that "impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess." Id. at § 55-10-401(1).

In the light most favorable to the State, we conclude that the evidence was legally sufficient for the jury to conclude beyond a reasonable doubt that the Defendant was intoxicated at the time of the crash.

The accident reconstruction indicated that the Defendant crossed the center line for between five and ten seconds; unlike the Defendant contends in his brief, this was a substantial amount of time, especially given a fifty-five mile per hour speed limit. The collision occurred when the Defendant's truck was three feet left of the center line in the victims' lane of travel. The tire marks indicated that although the Defendant's back right tire braked immediately before impact, he did not swerve or attempt to avoid the collision.

Despite the Defendant's blood sample being contaminated by his transfusions, his urine tested positive for methamphetamine, amphetamine, and oxycodone. Agent Castelbuono testified that methamphetamine and amphetamine could be present in urine for one to four days and that oxycodone was generally only present in urine for a twenty-four-hour period. He also stated that oxycodone was detectable in urine between thirty minutes and two hours after its ingestion, and symptoms of oxycodone intoxication, such as lethargy and slow response time, could last more than eight hours after ingestion. The Defendant's urine sample was collected about two hours after the crash.

In addition to the cognitive and speech problems observed by medical personnel at Three Rivers Hospital, the Defendant was loud, uncooperative, and aggressive—he attempted to bite a nurse's finger—which was consistent with Agent Castelbuono's description of amphetamine or methamphetamine intoxication. In addition, Dr. Hamilton testified that aggression was not a typical symptom of a concussion. The Defendant admitted to nurses that he was an IV drug user, lied about having a prescription, and had a fresh scab over a vein in his hand.

In his police interview, the Defendant admitted to taking oxycodone early on Sunday morning, some thirty-eight hours before the crash. The Defendant never admitted to the police that he used methamphetamine and specifically denied having used anything other than oxycodone. The jury was free to discredit this testimony and to draw any reasonable inferences from the Defendant's lying to the police.

The Defendant's urine test, his lack of candor with the police and medical staff, his behavior at Three Rivers Hospital, and the opinions of his treating nurses that he was intoxicated provided sufficient circumstantial evidence for the jury to find beyond a reasonable doubt that the victims' deaths were caused by the Defendant's intoxication at the time of the crash. He is not entitled to relief on this basis.

## IV. Mistrial

The Defendant contends that the trial court erred by declining to grant his motion for a mistrial after the prosecutor commented during rebuttal argument that the Defendant had not "acknowledged to" the jury that he used methamphetamine. The Defendant argues that this was an impermissible comment on the Defendant's decision not to testify and that the jury was prejudiced. The State responds that this issue has been waived, that the trial court issued a prompt curative instruction, and that the prosecutor clarified the comment such that a mistrial was not necessary.

We note that none of the numerous sidebar conversations were transcribed in this case. It is unclear whether it is the practice of the circuit court not to record them or whether it was an omission by the court reporter; nevertheless, their absence hinders our review on appeal. As such, we have only the Defendant's assertion that he requested a mistrial during the State's rebuttal, and any findings by the trial court are not documented. However, it was the Defendant's duty as the objecting party to preserve the issue by requesting findings of fact on the record, which in this case would have entailed a jury-out hearing. See Tenn. R. App. P. 36, ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.") 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."). This issue has, therefore, been waived.

Although the Defendant has not requested plain error relief, we conclude that it is not warranted. The record is not clear what happened in the trial court relative to the court's reasoning for declining to grant a mistrial, and it is not apparent that an unequivocal rule of law was breached or a substantial right of the Defendant was affected. See State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (enumerating the factors necessary to grant plain error relief). The court issued a curative instruction to the jury that it was to disregard the State's commentary, and the court reiterated that the Defendant had a right not to testify. The State, in turn, clarified that the Defendant had failed to disclose his methamphetamine use to the police. The State's comment was brief and promptly addressed. Therefore, manifest necessity for a mistrial did not arise in light of the court's

-30-

curative instruction, which the jury was presumed to follow.  See State v. Banks, 271 S.W.3d 90, 136-37 (Tenn. 2008) (concluding that the trial court's "curative instruction adequately remedied the potential prejudice caused by the prosecutor's erroneous argument" such that plain error did not occur).  The Defendant is not entitled to relief on this basis.

## V.    Sentencing

The Defendant contends that the trial court erred in imposing his sentences.  He challenges the length of his sentences, the court's ordering consecutive service, and the court's suspending the Defendant's driver's license for ten years.  The State responds that the trial court properly ordered the maximum sentence.

### a. Length of Sentence

The Defendant contends that the trial court erred by sentencing him to the maximum in-range sentence on each count.   His arguments can be divided into four broad categories: (1) the trial court's consideration of the facts of the case, including the evidence of intoxication, the severity of the offenses, the Defendant's criminal record, and the Defendant's expressed remorse; (2) procedural aspects of the sentencing hearing, namely that the presentence report was not provided in a timely manner and that the State conducted an "ambush" by introducing copies of indictments in other vehicular homicide cases; (3) the trial court's consideration of enhancement factors; and (4) a general argument that the sentence was excessive.[19]

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make on the defendant's own behalf about sentencing.   Tenn. Code Ann. § 40-35-210(b).  When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness.  State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012).  The burden of showing that a sentence is improper is upon the appealing party.  See Tenn.

---

[19] The Defendant's issue relates to both the length and consecutive service of his sentences.  We will address consecutive sentencing separately below.

Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). Carter, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2) & (4).

### i) Facts of the case

The trial court made extensive findings relative to sentencing. The Defendant's contention regarding evidence of intoxication relates to the sufficiency of the evidence and not sentencing. As discussed above, the evidence was sufficient to support a finding of intoxication.

The Defendant argues that the trial court's commentary on the severity of the offense indicated that it sentenced the Defendant "based upon the elements of the crime and emotions toward the victim[s]." The court found relative to the circumstances of the offense that it was "a very sad case" and the worst it had seen in a long legal career. The court also discussed at some length that the Defendant had not accepted responsibility for his "drug problem" or expressed a willingness to treat it, which in the court's opinion exacerbated the circumstances of the offense. However, the court also made lengthy findings regarding the Defendant's criminal history, lack of remorse, and probationary status, all of which justified a maximum in-range sentence. There is no indication that the court's decision was based solely on sympathy for the victims.

Relative to his criminal history, the Defendant argues that he was not proven to have a felony record; that misdemeanor convictions and traffic citations should not "carry the same weight as felony convictions"; that the Defendant's being on probation in Kentucky at the time of the crash was not adequately established; and that "the two-year [probationary] period was more analogous to a retirement or postponement of prosecution and not probation."

The court gave "great weight" to the Defendant's history of criminal behavior; we note that several charges the court discussed were dismissed and that the court did not separate its consideration of dismissed offenses and that of convictions. Although criminal behavior other than convictions may be properly considered during sentencing, the mere existence of a charge is not sufficient to establish that the conduct occurred, and consideration of charges "which were either dismissed, diverted, or in which a forfeiture was entered, was error." State v. Gerry Lynn Hensley, No. W2007-00878-CCA-R3-CD, 2008 WL 2483886, at *4 (Tenn. Crim. App. June 18, 2008) (citing State v. Terry A. Rogier, No. W2001-00551-CCA-R9-CD, 2001 WL 1117521, at *4 (Tenn. Crim. App. Sept. 19, 2001)).

However, even excluding the dismissed charges, the Defendant's criminal history was extensive. The record reflects that the Defendant had twenty-one prior convictions, including two that were equivalent to Tennessee felonies, five for speeding, two related to driving with no license or a suspended license, and one DWI. As the trial court noted, many of the convictions related to non-compliance with regulations like maintaining car insurance and registration or abiding by hunting requirements.

The Defendant's argument that a misdemeanor record should receive less weight than a felony record is inapposite in this court; absent a total departure from the principles of sentencing, which is not present here, this court does not disturb the determinations of a trial court relative to the weight of the evidence.

The Defendant's being on probation at the time of the offenses was also adequately proven. Mr. McGranahan testified regarding his conversation with the Kentucky Department of Probation and Parole, which was documented in the presentence report and confirmed that the Defendant was on unsupervised probation. In addition, a certified copy of the Kentucky court record containing the disposition of the Defendant's concealed weapon charge and a notation about his probation was exhibited to the sentencing hearing. As we will discuss below relative to enhancement factors, the nature of the Defendant's previous alternative sentence does not affect its applicability in sentencing.

The Defendant next argues that the court "unfairly judged" the Defendant for "his failure to enter a plea and admit his guilt" and by declining to testify at trial when the court found that his statement of remorse was incredible. The court gave particular weight to the Defendant's lack of remorse; contrary to the Defendant's assertion that the court was punishing the Defendant for declining to testify, the record reflects that the court clearly stated multiple times that it based its assessment of the Defendant's credibility on his behavior during trial. The court agreed with the witnesses who gave victim impact statements that the Defendant was seen joking and laughing during court recesses. Likewise, when Mr. McGranahan asked the Defendant about the crash, the Defendant stated only that he thought of the victims often, that he questioned his decision to go to his

mother's house that day, and that he did not wish to discuss it further. The Defendant's statement at sentencing contained an apology to the victims' families, but it mostly focused on the negative effect of the Defendant's confinement on his own family. We note defense counsel's concern at oral argument that the Defendant was penalized for having followed counsel's instructions to be "stoic" and not show emotion during trial. The record reflects, however, that the Defendant was not stoic, but rather behaved in such a manner that the court and others believed that he did not take the trial or the tragic events of the offense seriously.

### ii) Procedural concerns

The Defendant complains that the State "ambush[ed]" him with its collection of indictments from vehicular homicide cases in the judicial district. Likewise, the Defendant notes that the presentence report was not provided in a timely manner.

As a preliminary matter, the trial court stated for the record that the Defendant had waived the timeliness of the presentence report in order to accommodate administrative difficulties. Defense counsel agreed and praised Mr. McGranahan's thoroughness and the quality of the report. The Defendant may not waive his rights in the trial court and later protest that they were not observed.

Relative to the indictments, the Defendant has not cited legal authority to support his contention that the State had a duty to disclose its anticipated sentencing evidence. Tennessee Rule of Appellate Procedure 27(a)(7) provides, in relevant part, that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Likewise, Rule 10(b) of this court states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]" The Defendant has waived plenary review of this issue.

In any event, we conclude that plain error did not occur in this regard; a substantial right of the Defendant was not affected because the trial court afforded little weight to the indictments, noting that the disposition of the other cases was not presented. The Defendant is not entitled to relief on this basis.

### iii) Enhancement factors

The Defendant contends that the trial court misapplied factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high, because third parties were not threatened. He also argues that the court enhanced

his sentence based upon an improper factor, his failing to take responsibility for the 1998 DWI. Finally, he avers that his Kentucky probation was inadequately proven, that the probation was related to a misdemeanor conviction and not a felony, and that the probationary sentence was more akin to a deferred prosecution.

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); Carter, 254 S.W.3d at 342-43. Moreover, misapplication of an enhancement or mitigating factor no longer "invalidate[s] the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. Accordingly, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10.

The trial court found that several enhancement factors applied— that the Defendant had a "constant" history of criminal behavior; that the Defendant failed to comply with the conditions of his Kentucky probation; that the Defendant had no hesitation about committing a crime when the risk to human life was high; and that the Defendant was on probation at the time he committed the offenses. See Tenn. Code Ann. § 40-35-114(1), (8), (10), (13)(C). The court placed "great weight" on factor (1) and little weight on factor (10). The court found that no mitigating factors applied.

Although the Defendant contends that the trial court erred by applying enhancement factor (10) and by giving weight to the Defendant's failure to take responsibility for his role in the previous DWI, the misapplication of an enhancement factor or the application of an improper enhancement factor is not a basis for reversing a sentencing decision so long as the sentence otherwise complies with the purposes and principles of sentencing. Bise, 380 S.W.3d at 709-10. We note that other enhancement factors applied in this case to justify a maximum sentence, including the Defendant's criminal history and his being on probation at the time of the offenses.

Lastly, the Defendant's argument regarding whether his Kentucky probationary sentence was based upon a felony or misdemeanor is without merit. Although previous iterations of section 40-35-114(13) required a probationary sentence stemming from a felony conviction,[20] this requirement has since been removed by the legislature. See 2005 Tenn. Pub. Acts Ch. 353 (amending Tenn. Code Ann. § 40-35-114 in its entirety). Even

---

[20] See, e.g., State v. Turner, 41 S.W.3d 663, 673 (Tenn. Crim. App. 2000) (concluding that enhancement factor (13) was improperly applied when probation stemmed from a juvenile offense, not a prior felony conviction).

if the Defendant's sentence was a suspended prosecution, as he argues, a sentence may also be enhanced based upon "some form of judicially ordered release" or "any other type of release into the community under the direct or indirect supervision of any state or local governmental authority." Tenn. Code Ann. § 40-35-114(13)(F), (G). This factor was properly applied.

### iv) *Excessive sentence*

The Defendant generally contends that his sentence was excessive. As we have concluded, the length of the Defendant's sentences was supported by the record and the trial court's findings relative to enhancement factors and the circumstances of the offense. The Defendant had an extensive criminal history, including a DWI and multiple convictions related to driving. He was previously involved in a fatal accident caused by his falling asleep at the wheel. The Defendant was also on probation at the time of the offenses. The court was well within its discretion to order the maximum in-range sentence on each count. The Defendant is not entitled to relief on this basis.

### b. *Consecutive Sentencing*

The Defendant contends that the trial court erred by ordering consecutive service of his sentences. A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Tennessee Code Annotated section 40-35-115(b). "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences." State v. Pollard, 432 S.W.3d 851, 862 (Tenn. 2013) (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). In this case, the trial court concluded that the Defendant had an extensive record of criminal activity and that the Defendant committed the offenses while on probation. Tenn. Code Ann. § 40-35-115(b)(2), (6).

Furthermore, our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." Pollard, 432 S.W.3d at 860. This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Id. at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); State v. Bise, 380 S.W.3d 682, 705 (Tenn. 2012)). However, when imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to

achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

Relative to consecutive sentencing, the trial court found that the Defendant's record of criminal activity was extensive, noting that the Defendant had received a citation or was arrested every year, apart from one, beginning when he was nineteen years old. See Tenn. Code Ann. § 40-35-115(2). The Defendant also admitted to having used illegal drugs beginning at age fourteen until the day before the crash in this case. We note that generally, convictions are not required for this factor to be applicable. See State v. Koffman, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006). As we discussed above, consideration of the dismissed offenses was error in this case, but the Defendant's previous convictions alone constituted an extensive criminal history.

We note that one of the Defendant's sentencing contentions is that his Kentucky probationary sentence was not, in fact, probation, but an alternative sentence similar to a deferred prosecution. Although some non-probation alternative sentences cannot be used to satisfy Code section 40-35-115(b)(6),[21] the Defendant has the burden of proving that his sentence is improper. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. He has offered no evidence that in Kentucky "unsupervised probation" means something different than its name indicates; therefore, he is not entitled to relief on this basis.

The trial court properly imposed consecutive sentencing in this case. The record supports the court's findings regarding the Defendant's criminal record and probationary status at the time of the crash. Likewise, consecutive sentencing was reasonably related to the seriousness of the offense, in which three young people were killed due to the Defendant's intoxication and recklessness. The record further supports the court's finding that the Defendant's chances of rehabilitation were low and his risk to reoffend high. The Defendant's criminal record evinced an unwillingness to abide by the law and the instructions of the Kentucky court; he failed to take responsibility for his conduct in this case; and his demeanor during trial belied his expression of remorse at the sentencing hearing. The Defendant is not entitled to relief on this basis.

*c. Driver's License Suspension*

The Defendant contends that the trial court abused its discretion by suspending his driver's license for the maximum term allowable by law, arguing without citation to authority that the court "provided no basis for the decision." The State responds that this

---

[21] See, e.g., State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999) (concluding that community corrections sentence could not be used to impose consecutive sentencing under Code section 40-35-115(b)(6)).

issue has been waived and that alternatively, the court's decision was supported by the record.

We agree that because the Defendant provides no standard of review or legal authority to support his argument, this issue has been waived. See Tenn. R. App. P. 27(a)(7); Tenn. R. Crim. Ct. App. 10(b). Nonetheless, a ten-year license suspension was within the prescribed statutory range. See Tenn. Code Ann. § 39-13-213(c). Although the trial court did not make findings specific to the Defendant's driver's license, the court discussed at some length that the Defendant's criminal history contained numerous traffic offenses, including a previous DWI conviction, and that the court believed the Defendant would reoffend in the future. The court's reasoning was supported by the record and does not reflect an abuse of discretion.

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE